Rollins, S.
This decedent died in the city of New York on December 25, 1884. An instrument purporting to have-been executed by him as his last will and testament was soon afterwards propounded for probate in this court by Amelia Delacroix, who is named therein as executrix and universal legatee.
Objections to the validity and legality of this instrument-were filed, by various persons professing to be the decedent’s-next of kin. Certain of those persons asserted that he died unmarried, and of corase without leaving any lawful, children or child.
These contestants were David Darling and John Darling, who claimed to be his only surviving brothers, and Charles W. Hawkins, James D. Hawkins and Sarah A. Cosson, who claimed that their mother, who had predeceased the decedent, was at the time of her death his sole surviving sister.
The proponent did not dispute the right of the five persons above named to oppose the grant of her petition, but challenged the claim of a sixth contestant, Catherine Lefferts, who asserted herself to be the daughter of this decedent, born in lawful wedlock.
The great' bulk of the testimony upon which I am now to-pass has no relevancy to the issue whether the alleged will of William Darling is or is not a valid and effectual testamentary paper, but bears solely upon the issue whether William Darling was or was not the father of Catherine Lefferts.
For reasons that will presently be stated, I am very confidently of the opinion that the instrument which has given rise to this controversy is entitled to probate. There is no> occasion, therefore, for reviewing in detail the evidence submitted on behalf of Catherine Lefferts, and in behalf of the other contestants respectively, in support of their rival pretensions to be regarded as this decedent’s next of kin. All are alike entitled, however, to a finding upon this issue of kinship.
Catherine Lefferts is the widow of one Robert Lefferts, who died in this city in January, 1883. She became Robert Lefferts’ wife in 1857, having been for some years prior to that date the widow of one Charles McDuffy, to whom she had been married in 1853.
Mrs. Lefferts was the daughter of a man named William Darling and of a woman named Anna "Van Olinda. She was born at Charlestown, in Montgomery county, of this, state, in the year 1833. A decree divorcing her parents on account of her father’s adultery was pronounced by the court of chancery in July, 1836.
Catherine claims to have seen her father in New York *223 city about the year 1843, and at divers times thereafter down to 1852. During some portion at least of the years 1851 and 1852 she lived with him in Greenwich street, near Chambers, and subsequently at 57 Robinson street.
The two were arrested in July, 1852, upon a complaint in which they were jointly charged with incest, and were soon afterwards jointly indicted for that crime. The father was put on trial, was found guilty, and on October 5, 1852, was sentenced to be confined in the state prison for a term of ten years.
Mrs. LefEerts does not claim to have spoken to him or to have been in his company after his conviction, but says that on several occasions after that date, none of which occasions are specified, she saw him in the streets of New York.
Her testimony was rambling and incoherent and at times scarcely intelligible. She seemed to be a woman of nervous- and excitable temperament, honestly impressed with the-justice of her claim, and utterly incapable of comprehending the force of any evidence tending to overthrow it.
Now, was the man William Darling, who was Catherine LefEerts’ father, the William Darling whose will is here in controversy?
The decedent was at the time of his death professor of anatomy in the medical department of the University of the City of New York. He was born in Scotland and came to this country with other members of his father’s family at some time between 1820 and 1824.
In 1824 or 1825, as appears by the testimony of Mr. George Buckham, he was tutor in a school which stood at-the corner of what was then known as Greenwich lane and Amos street. In 1831 Mr Buckham recommended him to the authorities of Rutger’s Institute as a competent teacher in the classics and higher mathematics, but it is not shown that he was ever connected with that institution.
From the testimony of Henry A. Mott, it appears that Professor Barling was a tutor in the family of the late Dr. Valentine Mott, father of the witness, in the years 1831, 1832 and 1833, or thereabouts; that he was afterwards a member of Dr. Mott’s household until 1836, and for at least two or three years was a medical student under the doctor’s tuition.
In 1841 or 1842 he was a pupil at the medical department of the university and at a later period was occupied for several years in that institution as a demonstrator of anatomy. He was one of the attending physicians at the cholera hospital on Staten Island in 1851 and 1852, and three or four years later was selected by Dr. John M. Car *224 nochan, who was then in charge of the emigrant hospital on Staten Island, as his chief assistant.
In 1866, upon his return from Europe after a prolonged absence from this country, he was invited to the chair of anatomy in the University of the City of New York and continued to occupy that professorship until his death.
According to the testimony of many witnesses he was not only distinguished for his skill and knowledge in the sphere of his special activities, but was regarded by all with whom he was thrown into intimate association as a man of vigorous intellect, of profound erudition and of extensive general culture. Mr. Cohn Robertson quaintly said of him that “he was as familiar with his Xenophon as he was with his Burns, and with his Herodotus as he was with his Homer.”
The brief recital that I have made of incidents in the career of the William Darling who was distinctly identified in the testimony as the father of Catherine Lefferts, and of the incidents in the career of the William Darling who was distinctly identified as this decedent, may not suffice to demonstrate, though it strongly tends to demonstrate, the existence, during the period covered by the testimony, of two distinct individuals to whom such testimony relates.
Counsel for Mrs. Lefferts has called my attention to certain particulars in which, as he claims, marked coincidences have been shown between the statements of witnesses who have described the appearance, characteristics, habits, etc., of the man who was unquestionably Mrs. Lefferts’ father, and the statements of other witnesses who have given similar testimony as the man who was unquestionably Prof. William Darling.
The most pronounced of these coincidences are the following: Identity of name; reticence concerning family history; general similarity of stature; early association with Albany and Troy; residence in 1850 or thereabouts in Worcester street in this city, and existence at that time of some sort of scandal in connection with a woman.
The supposed probative force of these coincidences and of certain others which I lack the time to specify is opposed by testimony respecting contrarieties of such gravity and importance as to demonstrate beyond all reasonable doubt that William Darling who married Anna Van Olinda, and the William Darling whose will is here in controversy were not, in the latter’s lifetime, one and the same person, but were on the other hand distinct and different persons.
It is well proved that William Darling, the father of Catharine, was an illiterate man, of very limited intelligence, who was for some time prior to his marriage a farm laborer, and was for a considerable period between 1840 *225 and 1850 employed as a boatman on Hudson river steamboats. It is proved also that he was thereafter, until 1852, a member of the municipal police, and that his former examination in July of that year after he had been arrested for the crime of incest was signed with a mark. _
_ That these things could have been true of this decedent who was in 1881, 1832 and 1833 a tutor of the children of Dr. Valentine Mott, was thereafter a respected member of the doctor’s household, was for a considerable period after 1815 demonstrator of anatomy at the University Medical College, and was in 1851 or 1852 stationed as a physician at the Cholera Hospital in Staten Island, is simply incredible.
Whether William Darling the convict remained in prison until the expiration of his sentence does not appear, but it does appear that on January 26, 1866, he was formally restored by the then governor of the state to the citizenship which had been forfeited by his conviction and sentence.
It also appears that William Darling the decedent, who was a native of Scotland, was admitted to citizenship by the court of common pleas in the year 1851.
It must puzzle any persons who contend that the man who was naturalized in that year was the man who had been convicted of a felony two years previous, to explain on what possible theory he should have applied to have the citizenship restored in 1866.
The certificate of restoration is, on the other hand, easy of explanation if the convict was a native of Rhinebeck, in this state, as he declared himself to be upon his examination before the police magistrate.
From the testimony of Mr. Stevenson Haig, who knew this decedent in Scotland, it appears that the names of his brothers and sisters were James, John, Andrew, David, Mary and Christina. The witness was very positive that the decedent never had a brother called Nathan, and that he had no near relative who bore that name.
Mrs. Lefferts had previously testified that her father had a brother Nathan who was once a doorkeeper in the. executive mansion at Washington. Near the close of the trial there appeared a witness, Mrs. Maria Rogers, who, at the time of her marriage to her last husband, was the widow of this Nathan Darling. About a year after her marriage to Nathan Darling, 1866, she saw his brother William, who was known to her as the reputed father of Mrs. Lefferts. William called at the house where she was then living with her husband. She described him as a man of very scanty intelligence, of whose shabby appearance and demeanor her husband was professedly ashamed. She told of her *226 intimate acquaintance with Mary Thrall, who is shown by the statements of other witnesses, whom I regard as trustworthy, to have been a sister of Catharine Lefferts' father, at one time engaged in the business of book binding in this city.
Testimony was given in Mrs. Leffert’s behalf by one Dr. Hazeltine, to the effect that at the suggestion of this decedent he once employed this very Mary Thrall to stitch, for binding, a quantity of pamphlets, and that the decedent then spoke of Mary Thrall as his sister. This testimony is certainly important, if true. I do not deem it important.
For the reasons above indicated, I find that Catherine Lefferts, in the event that this decedent shall be declared intestate, has no interest in his estate, and has therefore no status to contest the probate of his will.
The contestants other than herself resist the probate of the paper here in controversy upon the ground that at the time of its execution Professor Darling was lacking in testable capacity, and that its dispositive provisions are not in accordance with his real wishes and purposes, but embody rather the wishes and purposes of its proponent.
It is needless to recite anew the testimony upon which I have already commented, by which it is demonstrated to my thorough satisfaction that the vigor of Professor Darling’s understanding, the force of his will, the readiness and retentiveness of his memory remained unimpaired until the very close of his fife.
It only remains to be considered, therefore, whether the contestants have succeeded in establishing that this disputed paper was not really born of his own thought, reflection and judgment, but that on the contrary this proponent, by means of influence and control such as the law condemns, compelled or persuaded him to accept it, and sign it and publish it as his last will and testament.
There is no room for doubt that when this instrument was executed, and thenceforward Until his death, the decedent entertained for this proponent sentiments of the highest affection and regard. This is abundantly demonstrated by the numerous letters that he is proved to have addressed to her from time to time during that period. Indeed, he speaks of her in a letter written more than a year before the date of the will, as standing “first and alone ” in his affections, and declares his purpose of entrusting to her keeping all the possessions that he should leave at his death.
The paper here in controversy received his signature in this city in April, 1881, on the eve of his departure for Burlington to fulfill his duties as a professor in the University of Vermont.
*227 That its preparation and execution were not brought about by her immediate interference is established unmistakably by the contents of a letter which he wrote her from Burlington on June 5, 1881, more than a month after this instrument came into being.
“Before I left New York,” he writes, “I made a will, in which I bequeathed all my property to you, and my desire is that you will always keep it as your own as long as you live.”
He then proceeds to state in detail the nature of his property, of which the will makes no specific mention.
“ My property consists of a lot, 100 feet square, in Pelamville, the taxes on which amount to four or five dollars per annum, payable yearly in February; also, of a lot on the north side of One Hundred and Forty-third street, the taxes being payable in October. Also, of my interest in the College building in Twenty-sixth street amounting'to $5,000. There is, besides, my museum of anatomy in the same building, its value being $1,500. I have a policy of insurance on the life of Dr. Thomas O’Brien for $1,500, the premium on which is $83, payable yearly, in the Universal Life Insurance Company, in Warren street, New York. Warren street is just opposite the City Hall. Any statement in this letter which you do not -understand I will explain to you when I see you about the end of this month.”
It is scarcely possible to conceive of evidence better calculated than that which is afforded by this letter, to dispel the notion that the paper here assailed does not give expression to the voluntary and genuine testamentary purpose of its maker.
I can recall no testimony which lends substantial support to the contestant’s claim, that this alleged will is the product of the undue influence of the proponent upon the mind and will of Prof. Darling, except the testimony of Mrs. Mary S. Jordan.
If she is to be credited, the decedent was for nearly three months, between January and April, 1880, a lodger at a boarding-house kept by her, at 156 Waverley place, in this city, and there, on at least two occasions, received the proponent in his apartments. Mrs. Jordan professes to have heard a loud and stormy conversation between the decedent and his visitor, in the course of which she denounced him as a “stingy, old miser,” and declared that, “if he did not will her his money and property she would sue him for breach of promise.”
There are many reasons why this testimony seems to me unworthy of credit; but if it is strictly true no deductions can be drawn from it which would warrant me, in the face *228 of the testimony for the proponent upon which I can confidently rely, in denying the prayer of her petition.
The paper which she has propounded may go to probate.